UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------X

SUNDIP POWAR,

        Plaintiff,

   -against-

THE CITY OF NEW YORK et al.,

        Defendants.

---------------------------------X

**MEMORANDUM & ORDER**

14-CV-4053 (KAM)(RER)

**MATSUMOTO, United States District Judge:**

      Plaintiff Sundip Powar ("plaintiff" or "Powar") alleges, pursuant to 42 U.S.C. § 1983, that New York City Police Department Detective Salvator Zambito ("defendant" or "Det. Zambito") falsely arrested him on January 21, 2013. Plaintiff also asserts state law claims of intentional infliction of emotional distress and negligent infliction of emotional distress against defendant. Defendant has moved for summary judgment on all three claims. For the reasons provided herein, defendant's motion for summary judgment is GRANTED as to plaintiff's federal false arrest claim. The court declines to exercise supplemental jurisdiction over plaintiff's intentional infliction of emotional distress and negligent infliction of emotional distress claims.

## BACKGROUND

      The facts provided below derive from the parties' Local

1

Rule 56.1 statements, as well as from the deposition testimony and other documents attached both in support of and in opposition to defendant's motion for summary judgment. (ECF No. 35, Defendant's Statement of Material Facts ("Def. 56.1"); ECF No. 39, Plaintiff's Statement of Material Facts and Response to Defendant's Statement of Material Facts ("Pl. 56.1"); ECF No. 41, Defendant's Reply to Plaintiff's Response to Defendant's Statement of Material Facts ("Def. 56.1 Reply"); ECF No. 36, Declaration of Liza Sohn in Support of Defendant's Motion for Summary Judgment ("Sohn Decl.").) The facts are "either not disputed by the parties or are construed in the light most favorable to the [plaintiff], as required on a motion for summary judgment." *Roman, Inc. v. Fifth Ave., LLC*, No. 99-CV-456, 2000 WL 502620, at *1 (D. Conn. Mar. 20, 2000) (citing *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997)). Unless otherwise noted, "citations to the parties' Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence." *EverHome Mortgage Co. v. Charter Oak Fire Ins. Co.*, No. 07-CV-98, 2012 WL 868961, at *1 n.1 (E.D.N.Y. Mar. 14, 2012).

Plaintiff's response to defendant's Rule 56.1 statement repeatedly fails to cite to admissible evidence. (Pl. 56.1 at

¶¶ 34, 36-37, 49-51, 60, 63-64, 66, 76, 92.) Under Local Rule 56.1(c), numbered paragraphs in a moving party's statement "will be deemed to be admitted . . . unless specifically controverted by a correspondingly numbered paragraph" in the nonmovant's statement. Local Rule 56.1(d), in turn, requires each paragraph in a movant's and nonmovant's statements to be "followed by citation to evidence which would be admissible." The Second Circuit has made clear that that if the "opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003).[1]

## I.  *Factual Background*

The events underlying this action took place primarily on January 16, 2013 and January 20, 2016.

### A.  *The January 16, 2013 Incident*

On the evening of January 16, 2013, plaintiff was taking

---

[1] The court will not deem a fact admitted that is not supported by evidence in the record. "[T]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). The court has independently and exhaustively reviewed the entire record to ensure that all uncontradicted factual assertions are supported by admissible evidence. Additionally, where there are disputes regarding admissibility of evidence, the court resolves the dispute using its discretion according to the applicable rule of evidence. *See King v. Livent, Inc.*, 161 F. App'x 116, 117 (2d Cir. 2005) ("Evidentiary rulings defining the summary judgment record are reviewed for abuse of discretion." (citation omitted)).

trash out of his family's Brooklyn apartment along with his sister's ex-boyfriend. (Def. 56.1 at ¶ 8; Sohn Decl., Ex. O, Deposition of Sundip Powar ("Powar Dep.") at 27:24-28:1.) As he was putting the garbage out, he heard Ruslan Umirov call his name. (Def. 56.1 at ¶ 8.) Plaintiff and Umirov had known each other since they were children, but they had never spent time alone or in a group. (*Id.* at ¶ 57-58.) Plaintiff described Umirov as a well-known local drug dealer. (*Id.* at ¶ 59.) Plaintiff believed that Umirov was angry with plaintiff because plaintiff had been "talking about [Umirov's] girlfriend and talking about [Umirov]." (Powar Dep. at 59:21-25.) After Umirov called plaintiff's name, Umirov took out a knife and chased plaintiff. (Def. 56.1 at ¶ 10.) Plaintiff observed Umirov "pull out something" that plaintiff believed to be a firearm. (Powar Dep. at 61:12-62:4; Def. 56.1 at ¶ 11.) Plaintiff ran inside his house, after which plaintiff heard a gunshot that he attributed to Umirov. (Powar Dep. at 61:5-62:23; Def. 56.1 at ¶ 14.) Plaintiff subsequently contacted the police. (*Id.* at ¶ 13.) After his encounter with Umirov, plaintiff received threatening text messages from Umirov.[2] (*Id.* at ¶ 21.)

---

[2] The record is clear that neither plaintiff nor Umirov had ever filed complaints against (or communicated directly with) each other until the encounter outside plaintiff's home on the evening of January 16, 2013. Plaintiff argues that Umirov "sent threatening text messages to the plaintiff in the days leading up to the January 16, 2013 arrest." (Pl. 56.1 at ¶ 63.) Plaintiff's deposition testimony, however, is to the contrary:

When police officers arrived at his home, plaintiff informed them that Umirov had chased plaintiff and pulled out a gun. (*Id.* at ¶ 14.) Umirov, however, separately spoke with police officers about the encounter. (*Id.* at ¶ 17; *see also* Sohn Decl., Exs. G-J.) Umirov signed a statement alleging that plaintiff had shot him in the foot, but wrote that the bullet had not pierced his skin. (Sohn Decl., Ex. H.) On the basis of the two conflicting complaints, officers arrested both plaintiff and Umirov. (Def. 56.1 at ¶¶ 15-22; Sohn Decl., Ex. J.) Plaintiff and Umirov were both processed in the 62nd precinct and lodged in Central Booking together. (Def. 56.1 at ¶¶ 19, 22.) On January 18, 2013, Umirov obtained an order of protection against plaintiff. (Powar Dep. at 106:22-107:1; Sohn Decl., Ex. K.) The charges against plaintiff based on the January 16, 2013 incident were subsequently dismissed and sealed (Sohn Decl., Ex. K (dismissed on July 26, 2013)), and

---

Q: So, between the time when [Umirov] pulled out a knife as you were throwing out the garbage and the time that you were at the precinct [Umirov] sent you threatening messages –

A: Yes.

Q: -- between that span of time?

A: Yes.

(Powar Dep. at 76:3-8; *see also id.* at 32:16-18, 33:2-4 ("Q: And are you saying that these threats began on January 16, 2013? A: Yeah."), 60:16-21, 74:4-13.)

the charges against Umirov based on the January 16, 2013 incident were also dismissed. (Def. 56.1 at ¶ 24.) Between January 16, 2013, and January 20, 2013, plaintiff and Umirov had no further contact. (Def. 56.1 at ¶ 25; Powar Dep. at 92:18-20.)

B.    *The January 20, 2013 Incident*

Four days after the altercation between plaintiff and Umirov, on January 20, 2013, at or about 9:30 p.m., Umirov was in a vehicle with his girlfriend Sara Sharobim. (Sohn Decl., Exs. J, R-U, Y; *id.*, Ex. M, Deposition of Gilberto Alonso ("Alonso Dep.") at 6:19-7:18. *But see id.*, Ex. P, Deposition of Salvador Zambito ("Zambito Dep.") at 41:14-42:2 ("approximately 2030 hours").) He was subsequently stabbed in the chest. (Sohn Decl., Exs. J, R-U; Alonso Dep. at 7:14-18; Powar Dep. at 78:2-79:7.) The stabbing occurred in the confines of the 70th precinct. (Sohn Decl., Ex. T; Alonso Dep. at 11:1-10.) After the stabbing, however, Umirov and Sharobim drove to the 62nd precinct because he "kn[e]w almost every cop over there." (Def. 56.1 at ¶ 26; Sohn Decl., Ex. X, Grand Jury Testimony of Ruslan Umirov ("Umirov Tr.") at 14:23-15:12; Powar Dep. at 82:3-6.) Det. Gilberto Alonso was working on the 62nd precinct's Detective Squad on the evening of January 20, 2013, and observed Umirov and his girlfriend coming through the precinct's

front door and yelling for help.[3] (Def. 56.1 at ¶ 27; *see also* Alonso Dep. at 7:6-10.) Umirov was bleeding from his chest and gasping for air. (Def. 56.1 at ¶¶ 27, 29.) Det. Alonso immediately requested an ambulance and told Umirov to apply pressure to his chest. (Def. 56.1 at ¶¶ 28, 31; Alonso Dep. at 9:13-23.) Umirov told Det. Alonso that "Sundip" had stabbed him. (Alonso Dep. at 10:1-6; Def. 56.1 at ¶ 30.) An ambulance arrived, and Umirov was transported to Lutheran Hospital. (Def. 56.1 at ¶¶ 32, 69.)

Det. Alonso subsequently notified NYPD headquarters to open up a "portal" on the case and placed plaintiff's name on the portal.[4] (*Id.* at ¶¶ 33, 35.) Det. Alonso further relayed to NYPD

---

[3] Defendant's statement of material facts mistakenly states that Umirov came into the 62nd precinct on January 21, 2013. (Def. 56.1 at ¶ 26; *see also* Pl. 56.1 at ¶ 26; Def. 56.1 Reply at ¶ 26.) All of the evidence of record (including the deposition testimony cited by defendant in support of the assertion that Umirov arrived at the 62nd precinct on January 21, 2013) is clear that Umirov arrived at the 62nd precinct on the evening of January 20, 2013, rather than the early morning of January 21, 2013. (*See supra.*) This error is not material, however, to the court's determination.

[4] Plaintiff does not object to Det. Alonso's testimony about placing plaintiff's name on the portal (Pl. 56.1 at ¶ 35), but contends that Det. Alonso's underlying testimony about Umirov's statement identifying plaintiff is hearsay. (Pl. 56.1 at ¶ 30.) Defendant argues that the statement is admissible as a present sense impression, an excited utterance, or a statement of Umirov's state of mind under Fed. R. Evid. 803(1)-(3). (Def. Reply at ¶ 30.) As an initial matter, the statement does not appear to be offered for the truth of the matter asserted. Instead, the statement is offered to establish the source for Alonso's undisputed placement of plaintiff's name on the NYPD portal. Further, even if the statement were offered for the truth of the matter asserted, Umirov's identification — made shortly after the stabbing while Umirov was undisputedly "bleeding from his chest" and "gasping for air" (Def. 56.1 at ¶¶ 27, 29) — was admissible, through Det. Alonso's testimony, as an excited utterance. *See White v. Illinois*, 502 U.S. 346, 349-50 (1992) (finding that statements made by victim to police 45 minutes after sexual assault and to medical personnel at hospital four hours after assault were admissible under Fed. R. Evid. 803(2) as excited

headquarters that Umirov and plaintiff had been involved in a shooting on January 16, 2013 in the 62nd precinct. (Def. 56.1 at ¶ 36.)

The parties dispute whether Det. Alonso placed a call to the 70th precinct to relay information about the stabbing, which had occurred within the 70th precinct. (*Compare* Def. 56.1 at ¶ 37, *with* Pl. 56.1 at ¶ 37.) Det. Alonso stated during his deposition that he could not recall whether he had notified anyone at the 70th precinct, but that it would be his practice to do so because the precinct in which a crime occurs is the precinct responsible for the investigation of the crime. (Alonso Dep. at 16:20-20:16.) Viewing the facts in the light most favorable to plaintiff, however, Det. Alonso did not directly contact anyone in the 70th precinct immediately after the stabbing.

At approximately 10:25 p.m. on January 20, 2013, Umirov's girlfriend, Sharobim, arrived at the 70th precinct and

---

utterances); *United States v. Fell*, 531 F.3d 197, 231 (2d Cir. 2008) (recognizing that the "key question governing admission [under the excited utterance exception] is whether the declarant was, within the meaning of Rule 803(2), under the stress of excitement caused by the event or condition" (internal quotation marks and citation omitted)); *see also United States v. Carneglia*, 256 F.R.D. 384, 392 (E.D.N.Y. 2009) (finding eyewitness's statements to officer recorded in a police report — and made one hour after he witnessed an individual fire several gunshots into the car of a murder victim — were admissible as excited utterances under Fed. R. Evid. 803(2) or as present sense impressions under Fed. R. Evid. 803(1)). The undisputed evidence before the court establishes that Umirov was under the stress of being stabbed in the chest when he made the statement regarding defendant.

spoke with Police Officer Cristina Hernandez-Felix. (Sohn Decl.,
Ex. T; Pl. 56.1 at ¶ 122; Def. 56.1 Reply at ¶¶ 122, 125.) Officer
Hernandez-Felix recorded Sharobim's statement as follows:

> [Between 9:30 and 9:35 p.m. on January 20, 2013,] "1"
> MALE APPROACHED VEHICLE AT [1346 E. 17th St.] WHEN
> SUSPECT ENTERED REAR SEAT OF REPORTERS VEHICLE AND BEGAN
> ARGUING WITH VICTIM. BOTH VICTIM & PERP EXITED VEHICLE
> AND WALKED AWAY FROM VEHICLE. VICTIM RETURNED TO
> REPORTERS VEHICLE AND STATED TO REPORTER THAT, "HE WAS
> STABBED WITH AN UNKNOWN OBJECT."

(Sohn Decl., Ex. T.) The report lists an individual named "Tyreq
Unk"[5] as "wanted," and further describes Sharobim as the "reporter"
and Umirov as the "victim." (*Id.*)

C.   *Detective Zambito's Investigation and Plaintiff's
     January 21, 2013 Arrest*

On January 21, 2013, Det. Zambito was working at the
70th precinct when he was notified about the stabbing. (Def. 56.1
at ¶ 67; Ex. R.) At approximately 1 a.m. on January 21, 2013, as
soon as he learned about the stabbing, Det. Zambito went to
Lutheran Hospital to check on the status of Umirov. (Def. 56.1 at
¶ 69; Ex. R.) When Det. Zambito arrived at the hospital, he
observed that Umirov appeared "drowsy" and "medicated." (Zambito
Dep. at 18:15-25, 42:12-23; Ex. R; Pl. 56.1 at ¶ 119.) Umirov told
Det. Zambito that he had been stabbed by a sharp object. (Def.

---

[5] The record contains various different ways of spelling Tyreq Unq's first name.
For consistency, the court will refer to this individual as "Tyreq."

56.1 at ¶ 70; Pl. 56.1 at ¶ 118.)

Umirov relayed to Det. Zambito the details of the stabbing.[6] (Def. 56.1 at ¶¶ 70-73; Zambito Dep. at 41:13-42:11.) Umirov told Det. Zambito that he and his girlfriend were parked on a residential street in Brooklyn at 8:30 p.m on January 20, 2014, when the perpetrator entered the rear seat, began arguing with Umirov, and called Umirov a rat and a snitch. (Def. 56.1 at ¶ 71.) Umirov further explained that Umirov and the perpetrator exited the vehicle, a struggle ensued, and the perpetrator stabbed Umirov in the upper left chest. (*Id.*) Umirov also told Det. Zambito that there had been a group of three or four individuals present during the assault, including Tyreq. (Zambito Dep. at 53:16-54:9; Def. 56.1 Reply at ¶ 93; *see also* Umirov Tr. at 11:7-12.) Umirov relayed to Det. Zambito, however, that Tyreq was "just there" at the scene

---

[6] Plaintiff contends that Umirov's account of the stabbing provided to Det. Zambito cannot be considered on this motion because Umirov's statements constitute inadmissible hearsay. (*See* Pl. 56.1 at ¶¶ 70-73.) Here, however, the "statements regarding plaintiff are not being offered for the truth of the matter asserted, *i.e.,* that plaintiff in fact assaulted the victim, but rather to determine whether the information Detective [Zambito] had when he arrested plaintiff establishes probable cause." *Batson-Kirk v. City of New York*, No. 07-CV-1950, 2009 WL 1505707, at *5 (E.D.N.Y. May 28, 2009) (citing *United States v. Puzzo*, 928 F.2d 1356, 1365 (2d Cir. 1991)). Umirov's statements would alternatively fall into the hearsay exception under Fed. R. Evid. 803(3) because the statements "may also be viewed as showing [Det. Zambito's] state of mind at the time of the arrest." *Id.; see also Marin v. City of New York*, No. 04-CV-3194, 2006 WL 2167082, at *5 (E.D.N.Y. Aug. 1, 2006) ("While hearsay may not be used to support a motion for summary judgment, a detective may rely on hearsay in determining whether there is probable cause to arrest a suspect. Moreover, because the statements are offered to show the information [the defendant detective] had when he arrested [the plaintiff], they are not inadmissable hearsay on this motion." (citation omitted)).

of the stabbing. (*See* Pl. 56.1 at ¶ 126; Def. 56.1 Reply at ¶ 126; Zambito Dep. at 26:23-27:4.) Umirov told Det. Zambito that he subsequently fled back to his car and was admitted to Lutheran Hospital. (Def. 56.1 at ¶ 72.) Umirov explained to Det. Zambito that he was stabbed by the same person who had shot him the prior week. (Zambito Dep. at 19:13-17.) Viewing the facts in the light most favorable to plaintiff, however, Umirov did not give Det. Zambito plaintiff's name during their first interview. (Pl. 56.1 at ¶¶ 118, 121; Def. 56.1 Reply at ¶ 121.)

Det. Zambito returned to the 70th precinct and ran a computer search to verify whether a shooting had occurred the prior week. (Pl. 56.1 at ¶ 121; Def. 56.1 at ¶ 74.) The search revealed plaintiff's name, and information about the prior week's shooting in the 62nd precinct. (Pl. 56.1 at ¶ 121; *see also* Def. 56.1 at ¶ 77.) Det. Zambito also became aware of the information contained in Officer Hernandez-Felix's report regarding Sharobim's statement. (Def. 56.1 Reply at ¶ 125.) Det. Zambito's notes include a reference to Tyreq (Sohn Decl., Ex. V; Zambito Dep. at 47:23-25) and Det. Zambito stated that he believed he ran a mugshot photo of Tyreq. (Def. 56.1 at ¶ 80; Zambito Dep. at 48:23-24.) The record contains an arrest report with a redacted photo of an individual bearing the name "Tariq Akhlaq," and two notes handwritten by Det.

11

Zambito: (1) "Witness: Sara Sharobim" and (2) "Have her view photo of possible 2nd piece." (Sohn Decl., Ex. W; Zambito Dep. at 28:2-15, 46:24-47:2.) Finally, Det. Zambito contacted Det. Alonso in the 62nd precinct, but Det. Zambito could not recall the substance of their conversation.[7] (Def. 56.1 at ¶ 76; Pl. 56.1 at ¶ 76; *see also* Sohn Decl., Ex. V.) Det. Zambito did not interview Sharobim. (Zambito Dep. at 20:14-16 ("Q: Did you interview Mr. Umirov's girlfriend? A: No, I didn't interview her."), 24:7-10, 55:7-10.)

At approximately 10:30 a.m. on January 21, 2013, Det. Zambito returned to Lutheran Hospital bearing a photograph of plaintiff. (Def. 56.1 at ¶ 82; Sohn Decl., Ex. Q.) Umirov identified the individual in the photograph as the individual who had stabbed him. (Def. 56.1 at ¶ 83; Sohn Decl., Ex. Q.) Det. Zambito asked Umirov how he recognized the individual, and Det. Zambito memorialized Umirov's response below the photograph: "The person who STABBED and shot me! 'Sundip' a week ago." (Def. 56.1 at ¶¶ 83-86; Sohn Decl., Ex. Q.) Umirov signed the statement. (Sohn Decl., Ex. Q.)

A half hour after Umirov's identification of the defendant as the individual who stabbed him, at approximately 11:00

---

[7] Viewing the facts in the light most favorable to plaintiff, Det. Alonso did not relay to Det. Zambito that Umirov had identified plaintiff as Umirov's assailant.

a.m. on January 21, 2013, Det. Zambito returned to the 70th precinct and activated a "wanted card" on plaintiff. (Sohn Decl., Ex. R; Zambito Dep. at 50:9-13.) Det. Zambito also ran a criminal history search on both Umirov and plaintiff. (Sohn Decl., Ex. R; Zambito Dep. at 44:14-18.) At 2:15 p.m. on January 21, 2013, Det. Zambito and another detective arrested plaintiff at his home. (Sohn Decl., Ex. J; Def. 56.1 at ¶¶ 88-89.) Det. Zambito informed plaintiff at the 70th precinct that he was being arrested for assault, at which time plaintiff responded that he "did not do it." (Def. 56.1 at ¶¶ 90-91.) Plaintiff also told Det. Zambito that Umirov was "lying" and that Umirov had blamed plaintiff "because of the first arrest." (Powar Dep. at 90:1-8.) Det. Zambito initially charged plaintiff with attempted murder in the second degree, gang assault, and criminal possession of a weapon in the fourth degree. (Ex. S.)

Back at the 70th precinct, Det. Zambito swore out a criminal complaint. (Def. 56.1 at ¶ 92.) The complaint provided that Umirov informed Det. Zambito that plaintiff acted in concert with three unapprehended individuals who approached Umirov and encircled him, and that plaintiff struck Umirov in the chest with a sharp object. (Def. 56.1 at ¶ 97; Sohn Decl., Ex. Y.) Det. Zambito did not believe that Tyreq had stabbed plaintiff, and he

13

did not attempt to locate any of the three unapprehended individuals referenced in the criminal complaint. (Def. 56.1 at ¶¶ 95, 98.) Although Det. Zambito requested that fingerprints be lifted from Umirov's vehicle, the results of the fingerprint analysis are unknown. (*Id.* at ¶¶ 99, 101.)

On January 25, 2013, Umirov testified before a grand jury. (Sohn Decl., Ex. X.) Plaintiff was subsequently indicted for, *inter alia*, attempted murder, multiple counts of assault and attempted assault, and criminal possession of a weapon in the fourth degree. (Sohn Decl., Ex. Z.) Plaintiff was detained for two months before he was released on bail. (Def. 56.1 at ¶ 104; Powar Dep. at ¶¶ 97:6-11.) Plaintiff's criminal case was ultimately dismissed. (Def. 56.1 at ¶ 56; Sohn Decl., Ex. K.) He has since been diagnosed with depression and anxiety, and has received counseling. (Def. 56.1 at ¶¶ 105-06.)

## II. *Procedural History*

On June 30, 2014, plaintiff commenced this action. (ECF No. 1.) On May 13, 2015, plaintiff submitted an amended complaint. (ECF No. 22, duplicated at ECF Nos. 23-24.) Although plaintiff initially named other individuals and entities, and asserted multiple additional claims, by stipulation dated June 26, 2015, plaintiff withdrew all claims with the exception of his claims

14

against Det. Zambito for: (1) false arrest pursuant to 42 U.S.C. § 1983; (2) intentional infliction of emotional distress pursuant to state law; and (3) negligent infliction of emotional distress pursuant to state law. (ECF No. 30.)

Defendant has moved for summary judgment on all three claims and filed a memorandum of law in support of his motion. (ECF No. 37, Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem.").) Plaintiff filed an opposition, to which defendant replied. (ECF No. 38, Plaintiff's Memorandum in Opposition[8] to Defendant's Motions for Summary Judgment ("Pl. Opp'n"); ECF No. 42, Defendant's Reply in Support of Motion for Summary Judgment ("Def. Reply").)

## LEGAL STANDARD

Summary judgment is appropriate "only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 465 (2d Cir. 2001); *see also* Fed. R. Civ. P. 56(a). "In determining whether there are genuine issues of material fact, [the court is] required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against

---

[8] Plaintiff's opposition lacks page numbers. The court's citations to plaintiff's opposition consider the first page to be the page containing plaintiff's "preliminary statement."

whom summary judgment is sought." *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004) (internal quotation marks and citation omitted). "On summary judgment, the court must consider 'not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" *Lembaris v. Univ. of Rochester*, 566 F. App'x 89, 90 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## DISCUSSION

As noted above, plaintiff brings three claims against defendant for: (1) false arrest under 42 U.S.C. § 1983; (2) intentional infliction of emotional distress; and (3) negligent infliction of emotional distress. The court turns first to plaintiff's federal false arrest claim.

### I. *False Arrest Under § 1983*

#### A. *Applicable Law*

Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . .

16

> subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall
> be liable to the party injured. . . .

A § 1983 claim has two essential elements. First, "the conduct complained of must have been committed by a person acting under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citation omitted). Second, "the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Id.* (citation omitted). Here, there is no dispute that the Det. Zambito was acting under color of state law when he arrested plaintiff. Accordingly, the central issue is whether Det. Zambito falsely arrested plaintiff.

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citation omitted). The elements of false arrest require the plaintiff to establish that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the

17

confinement was not otherwise privileged." *Bernshtein v. City of New York*, 496 F. App'x 140, 141 (2d Cir. 2012) (internal quotation marks and citation omitted). Defendant does not dispute that plaintiff has adequately established the first three elements. Only the fourth element, which concerns whether the confinement was privileged, is at issue in this action. *See id.* A confinement is privileged if an officer has probable cause to arrest an individual. *See Alvarez v. Cty. of Orange, N.Y.*, 95 F. Supp. 3d 385, 399 (S.D.N.Y. 2015).

Generally, the existence of probable cause to arrest for any crime is a complete defense to an action for false arrest. *See id.; see also Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (internal quotation marks and citation omitted). Probable cause is evaluated on an objective basis, *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007), and "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."

*Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). An officer "need not be certain that a subsequent prosecution will succeed," *Crawford v. City of New York*, 477 F. App'x 777, 778-79 (2d Cir. 2012), and it is "of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation." *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) (internal quotation marks and citation omitted). "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citation omitted).[9]

"When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citations omitted); *Singer*

---

[9] *See also Baker v. McCollan*, 443 U.S. 137, 145-46 (1979) ("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."); *Krause*, 887 F.2d at 372 (concluding that defendant was entitled to qualified immunity from plaintiff's Section 1983 claim, stating "[i]t would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity. . . . Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.").

*v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."). Generally, however, the "veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." *Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992); *see also Adams v. Williams*, 407 U.S. 143, 147 (1972) ("[W]hen the victim of a street crime seeks immediate police aid and gives a description of his assailant . . . the subtleties of the hearsay rule should not thwart an appropriate police response.").

Officers are not, however, "absolutely privileged to arrest upon a charge by any private individual who claims to be a victim. Some people have axes to grind." *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998). "The most common situation in which such doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation. When such a relationship exists, and is known to the arresting officer before the arrest is made, the complaint alone may not constitute probable cause; the officer

may need to investigate further." *Id.* "[A] putative victim's veracity may be corroborated . . . by such things as (1) the officer's observation of the putative victim's physical injuries, (2) the level of detail and consistency in the putative victim's description of events, (3) the putative victim's identification of the plaintiff by name and physical description, and (4) incriminating statements by the plaintiff." *Williams v. Schultz*, No. 06-CV-1104, 2008 WL 4635383, at *9 (N.D.N.Y. Oct. 16, 2008).

B.   *Analysis*

Plaintiff's false arrest claim fails because, based on the undisputed facts in the record, Det. Zambito had probable cause to arrest plaintiff for criminal possession of a weapon in the fourth degree[10] and attempted murder in the second degree.[11] The court finds that Det. Zambito had probable cause based on: (1) Umirov's identification of plaintiff as Umirov's assailant in the

---

[10] "A person is guilty of criminal possession of a weapon in the fourth degree when . . . [h]e possesses any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another . . . ." N.Y. Penal Law § 265.01(2).

[11] "A person is guilty of murder in the second degree when . . . [u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. Penal Law § 125.25(2); *see also* N.Y. Penal Law § 110 ("A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime.").

January 20, 2013 stabbing; (2) Det. Zambito's observation of Umirov's wounds; and (3) Det. Zambito's knowledge about the January 16, 2013 shooting involving plaintiff and Umirov.

### i. Probable Cause Existed for the January 21, 2013 Arrest

First, Umirov's identification of plaintiff as his assailant directly to Det. Zambito provides significant support for the probable cause determination here. Within hours of the stabbing incident, Umirov told Det. Zambito that the individual who had stabbed him was the same person who had shot him the prior week. (Def. 56.1 at ¶ 73.) Det. Zambito was able to confirm after a computer search at the 70th precinct that there had been a shooting the prior week involving plaintiff and Umirov. (*Id.* at ¶ 74, 77.) Det. Zambito's investigation went further. He brought a photograph of plaintiff to Lutheran Hospital for Umirov to view, in order to confirm with Umirov that plaintiff had been his assailant in the January 20, 2013 stabbing. (Def. 56.1 at ¶¶ 82-86.) On the photograph, Umirov signed a statement that he made to Det. Zambito: "The person who STABBED and shot me! 'Sundip' a week ago." (*Id.;* Sohn Decl., Ex. Q.) Courts have regularly held that an identification of a suspect by a victim or witness can, on its own, supply probable cause. *See, e.g.*, *Nnodimele v. Derienzo*, No. 13-CV-3461, 2016 WL 337751, at *8 (E.D.N.Y. Jan. 27, 2016)

("Identification of the suspect by a victim or eyewitness can constitute, by itself, probable cause to prosecute."); *Gaston v. City of New York*, 851 F. Supp. 2d 780, 788 (S.D.N.Y. 2012) (finding that victim's identification of attacker in a photo array and in a lineup established probable cause); *Williams v. City of N.Y.*, No. 10-CV-2676, 2012 WL 511533, at *3 (E.D.N.Y. Feb. 15, 2012) (finding probable cause to prosecute based on the fact that "at least one of the eyewitnesses had identified [plaintiff] as the shooter"); *Thompson v. City of N.Y.*, 603 F. Supp. 2d 650, 657-58 (S.D.N.Y. 2009) (finding, based on one witness's identification of plaintiff in lineup and photo array, probable cause to arrest and prosecute).

Second, Det. Zambito directly viewed Umirov's injuries at the hospital, corroborating an important part of Umirov's narrative. (Def. 56.1 at ¶ 69; Pl. 56.1 at ¶ 119; Zambito Dep. at 18:10-25 (Det. Zambito's observation that Umirov appeared drowsy and medicated); Sohn Decl., Ex. R (same).) A police officer's observation of physical injuries corroborating a victim's statement can reinforce a probable cause determination. *See Ricciuti*, 124 F.3d at 128 (finding probable cause to arrest a plaintiff on basis of police officer's choice to believe claimed victim's narrative about a physical altercation based on visible

23

injuries); *Williams*, 2008 WL 4635383, at *9 (finding that putative victim's veracity can be corroborated by "officer's observation of the putative victim's physical injuries"); *Thomas v. Cty. of Putnam*, 262 F. Supp. 2d 241, 246 (S.D.N.Y. 2003) ("In addition to the signed information, however, there are also the injuries to [a victim's] body that [a police officer] observed which tend to support the existence of probable cause."); *Marin v. Viggiani*, No. 92-CV-3836, 1993 WL 404098, at *6 (S.D.N.Y. Oct. 5, 1993) ("[W]hen a putative victim precisely identifies the alleged perpetrator of a crime and there is independent corroborative evidence to support *at least some of the victim's assertions*, a person of reasonable caution is warranted in believing that an offense has been committed by the alleged perpetrator." (emphasis added)).

Third, Det. Zambito had information, including Umirov's statement, that plaintiff had reportedly shot Umirov earlier in the week. (Zambito Dep. at 19:13-22.) The information about plaintiff's prior shooting of Umirov provides further support for a finding of probable cause because plaintiff's prior alleged violence against Umirov made it more likely that he was responsible for the stabbing. See *Hogan v. Caputo*, No. 02-CV-1040, 2004 WL 1376395, at *7-8 (N.D.N.Y. June 21, 2004) (finding that plaintiff's history of "violent domestic disturbances," known to investigating

officer, provided support for probable cause to arrest plaintiff for endangering the welfare of a child).

Plaintiff essentially makes three arguments in support of his contention that defendant's investigation was insufficient and that he therefore lacked probable cause. First, plaintiff argues that, based on Officer Hernandez-Felix's report, Det. Zambito knew that Tyreq was a suspect and, thus, Det. Zambito was required to conduct a further investigation into Tyreq before arresting plaintiff. Second, plaintiff argues that the history between plaintiff and Umirov so undermined Umirov's credibility that Umirov's identification of plaintiff could not supply probable cause. Third, plaintiff argues that Umirov's failure to provide Det. Zambito with plaintiff's name during the first interview significantly undermined the value of Umirov's later identification.

### ii. Officer Hernandez-Felix's Report

First, plaintiff argues that Officer Hernandez-Felix's report of her interview with Umirov's purported girlfriend required Det. Zambito to conduct a further investigation into Tyreq. (Pl. Opp'n at 1 ("The main point in plaintiff's opposition is that one person (the victim's girlfriend) named an entirely different person as the assailant.").)

There is no dispute that Det. Zambito became aware of the information in Officer Hernandez-Felix's report before arresting plaintiff. (Def. 56.1 Reply at ¶ 125.) The report recorded the statement of Sharobim, Umirov's girlfriend, as follows:

> [Between 9:30 and 9:35 p.m. on January 20, 2013,] "1" MALE APPROACHED VEHICLE AT [1346 E. 17th St.] WHEN SUSPECT ENTERED REAR SEAT OF REPORTERS VEHICLE AND BEGAN ARGUING WITH VICTIM. BOTH VICTIM & PERP EXITED VEHICLE AND WALKED AWAY FROM VEHICLE. VICTIM RETURNED TO REPORTERS VEHICLE AND STATED TO REPORTER THAT, "HE WAS STABBED WITH AN UNKNOWN OBJECT."

(Sohn Decl., Ex. T.) The report does not describe any actions by Tyreq, but lists "Tyreq Unk" as "wanted." (*Id.*) Moreover, Sharobim reported that Umirov was stabbed outside and away from the vehicle while Sharobim remained in the vehicle. (*Id.*) There is no indication that Sharobim witnessed the stabbing.

Defendant characterizes the report as vague regarding Sharobim's identification of the assailant. (*See* Def. Reply at 4 ("Umirov's girlfriend never identified Tyrek as the assailant. The complaint report alleges only that Tyrek was present in Umirov's vehicle and argued with him, not that he was the stabber.").) Although the report uses the terms "'1' male," "suspect," and "perp," it is imprecise about Tyreq's involvement. Defendant concedes that the term "suspect" in the report refers to Tyreq,

the individual listed as "wanted" in the report. (*Id.*) The statement provides that the "suspect" entered the rear seat of the vehicle, but the language abruptly changes in the following sentence of the statement, and refers to the individual who entered the rear seat of the vehicle as the "perp." (Sohn Decl., Ex. T.) Det. Zambito speculated that Sharobim assumed that Tyreq was the sole perpetrator, based on her statement to another police officer. (Zambito Dep. at 29:3–12 ("Q: [Umirov's] girlfriend [who] was also there indicated that there was one perpetrator and that his name was Tireek? . . . A: I guess she assumed that he was a perpetrator . . . .").) Accordingly, the central question regarding Sharobim's statement is whether, construing the evidence in the light most favorable to plaintiff, Sharobim's statement triggered Det. Zambito's obligation to investigate Tyreq before arresting plaintiff.

The court concludes that probable cause to arrest plaintiff for the January 20, 2013 stabbing did not dissipate on the basis of Sharobim's statement. As an initial matter, Det. Zambito was not "required to explore and eliminate every theoretically plausible" exculpatory theory. *Curley*, 268 F.3d at 70. "Once an officer has probable cause, he or she is 'neither required nor allowed' to continue investigating, sifting and

weighing information." *Panetta v. Crowley*, 460 F.3d 388, 398 (2d Cir. 2006) (quoting *Krause*, 887 F.2d at 372); *see also Krause*, 887 F.2d at 371 ("[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation." (internal quotation marks and citation omitted)).

Where, as here, conflicting accounts make it "difficult to know who did what to whom," *Curley*, 268 F.3d at 68, officers are not obligated to resolve every inconsistency before arresting an individual. In *Curley*, for example, the plaintiff was arrested and charged with, *inter alia*, assault in connection with a barroom brawl. *See id.* at 68-70. Certain charges were ultimately dismissed, and the plaintiff was acquitted on the remaining charges. *See id.* at 68. Conflicting stories provided to officers by the plaintiff and two putative victims (one of whom had visible blood on his lip), the plaintiff argued, "should have prompted a more thorough investigation." *Id.* at 70. The court concluded otherwise, finding that "[a]lthough a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him." *Id.*

Similarly, in *Panetta*, an officer arrested the plaintiff for animal cruelty based on (1) the complaints of two individuals that the plaintiff's horse had been abused and (2) the officer's observation of the horse. *See* 460 F.3d at 391-93. One of the complainants held himself out as a peace officer and animal cruelty investigator, but did not reveal to the officer that the plaintiff had previously unsuccessfully sued the complainant for malicious prosecution stemming from the complainant's previous allegations that the horse had been mistreated. *See id.* at 391-92. The officer refused to contact the horse's veterinarian, over the plaintiff's objection that a call to the veterinarian would clear her of any misconduct. *See id.* at 398. The charges against the plaintiff were later dismissed based on the veterinarian's affidavit that the horse had not been mistreated. *See id.* at 393-94. The court determined that the officer's decision not to speak with the veterinarian did not "constitute a disregard for exculpatory evidence sufficient to eliminate probable cause" because, after confirming the presence of abuse symptoms alleged by the two complainants, the officer was under no obligation to conduct a further investigation before arresting the plaintiff for animal cruelty. *Id.* at 398.

Here, as in *Curley* and *Panetta*, there were conflicting accounts about the alleged criminal activity. In *Curley*, the arresting officers chose to believe the purported victims over the plaintiff. In *Panetta*, the arresting officer ignored the plaintiff's account and, over the plaintiff's objection, the very witness whose affidavit ultimately resulted in dismissal of the charges against the plaintiff. Det. Zambito's decision not to follow up on Sharobim's statement is no different. Umirov had identified plaintiff to Det. Zambito as his assailant, Det. Zambito had witnessed Umirov's injuries, and Det. Zambito had confirmed that an altercation had taken place between plaintiff and Umirov the prior week. Umirov had also told Det. Zambito that Tyreq was "just there." (Zambito Dep. at 26:23-27:4.) Det. Zambito was under no obligation to conduct a further investigation into Tyreq's involvement on the basis of Sharobim's imprecise statement to another police officer that may have identified Tyreq as the perpetrator, before arresting plaintiff.[12]

---

[12] Plaintiff also appears to argue that Det. Zambito's limited investigation into Tyreq (Det. Zambito wrote Tyreq's name down on his notepad and also wrote that he intended to have Sharobim look at Tyreq's photograph) proves that Det. Zambito was uncertain about whether plaintiff was the perpetrator. (Pl. Opp'n at 8.) Even if plaintiff is correct that Det. Zambito considered the possibility that Tyreq might be responsible for the stabbing, an officer's "subjective beliefs as to whether probable cause exists are irrelevant." *Annunziata v. City of New York*, 575 F. Supp. 2d 491, 495 (S.D.N.Y. 2008). Plaintiff's argument that the fingerprint analysis shows Det. Zambito's lack of certainty that plaintiff was the assailant (Pl. Opp'n at 12) fails for the same reason. Whether

### iii. Prior Relationship

Plaintiff next argues that the prior relationship between plaintiff and Umirov undermined Umirov's credibility and vitiated probable cause. (Pl. Opp'n at 9-13.) "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest *absent circumstances that raise doubts as to the victim's veracity*." *Singer*, 63 F.3d at 119 (emphasis added).

Viewing the facts in the light most favorable to plaintiff, although plaintiff and Umirov had known each other for many years, they had never spent time alone or in a group. (Def. 56.1 at ¶¶ 57-60.) They had no direct interaction with each other until the altercation on January 16, 2013.[13] (*Id.* at ¶ 60.) Further, between his January 16, 2013 arrest and his January 21, 2013 arrest, plaintiff had no contact with Umirov. (*Id.* at ¶ 65.) Aside from plaintiff's statements inculpating Umirov in the January 16,

---

an officer has probable cause to arrest is to be evaluated objectively. *See Jaegly*, 439 F.3d at 153-54.

[13] As noted earlier, plaintiff affirmatively misrepresents the record when he states that "Umirov sent text messages to [plaintiff] threatening him and his family *prior to* the January 16, 2013 incident." (Pl. Opp'n at 10 (emphasis added) (citing Powar Dep. at 32:13-25, 33:1-3).) The deposition testimony to which plaintiff cites makes clear that plaintiff stated that the text messages were sent "after [the January 16, 2013] incident." (Powar Dep. at 32:17-18.) There is no other permissible reading of the record. Moreover, there is no evidence that Det. Zambito was aware of the text threats that plaintiff claims he received from Umirov.

2013 incident, plaintiff did not believe there was any reason Umirov would accuse him of the January 20, 2013 stabbing. (Powar Dep. at 90:6-8 ("Q: Was there any other reason [besides the January 16, 2013 incident] that you believe Ru[]slan Umirov would place this assault on you? A: No.").) Viewing the facts in the light most favorable to plaintiff, Det. Zambito had knowledge, before arresting plaintiff, of the cross-complaints and arrests stemming from the January 16, 2013 incident, but there is no evidence that Det. Zambito was aware of other details about the length or nature of plaintiff's prior interactions with Umirov. (Powar Dep. at 84:16-85:1, 86:13-16.) Accordingly, the issue regarding Det. Zambito's knowledge of the cross-complaints on January 16, 2013, is whether the cross-complaints undermined Umirov's identification of plaintiff sufficiently to eliminate probable cause.

The court concludes that the cross-complaints did not so undermine the credibility of Umirov's identification of plaintiff that probable cause abated. It was reasonable for Det. Zambito to believe that both of Umirov's complaints were valid, or that only Umirov's complaint regarding the stabbing was valid. Even if Umirov's allegations regarding the January 16, 2013 incident were false, Det. Zambito had no obligation to resolve, and no means of resolving, any conflicting evidence in the cross-complaints

arising out of the January 16, 2013 incident. Further, even in cases where a far more significant and contentious relationship between the complainant and the arrestee was known to the officer, courts have found probable cause to believe a crime had been committed based in part on the complainant's statements. For example, in *Fernandez v. City of New York*, No. 02-CV-8195, 2003 WL 21756140, at *2 (S.D.N.Y. July 29, 2003), there was an ongoing dispute between neighbors. The plaintiffs had made multiple calls to the NYPD to complain about a neighbor's noise and improper behavior. *See id.* The neighbor had written to the NYPD regarding the plaintiffs' complaints (alleging that the plaintiffs were harassing him) and the police had visited the neighbor's apartment repeatedly in response to the plaintiffs' complaints. *See id.* The dispute culminated in the neighbor and the neighbor's son alleging to NYPD officers that one of the plaintiffs had punched the neighbor and ransacked the neighbor's apartment. *See id.* at *2-3, 5. An officer responding to the call observed blood "all over" the neighbor's apartment. *See id.* at *3. Over the plaintiffs' protestations that the neighbor lacked credibility, that the plaintiffs had made several complaints about the neighbor, and that the plaintiffs had not even left their own apartment, the

officers arrested the particular plaintiff alleged to have punched the neighbor and ransacked the neighbor's apartment. *See id.*

The arrested plaintiff was acquitted of attempted assault in the third degree, but was found guilty of second degree harassment. *See id.* Both plaintiffs subsequently brought a civil rights action. *See id.* at *1. The court, *inter alia*, granted the officers' motion to dismiss the arrested plaintiff's false arrest claim, finding that "[a]llegations of bad blood simply do not undercut [the neighbor's] assertion, or that of his son, that [the arrested plaintiff] took the dispute to a physically violent level, especially in view of the corroborating evidence of the bloody and ransacked . . . apartment. Moreover, faced with such allegations of physical violence, it is unreasonable to suggest that the police should merely turn a blind eye." *Id.* at *5.

Here, like the arrested plaintiff and the neighbor in *Fernandez*, plaintiff and Umirov had a recent, prior violent confrontation involving a shooting. Det. Zambito knew of the confrontation. In *Fernandez*, the history was far more substantial (involving multiple complaints from both parties and visits from the police) and far more likely to cast doubt on the legitimacy of the neighbor's allegations. Here, by contrast, only a single event known to Det. Zambito *might* have influenced Umirov's credibility.

34

Additionally, just as an arresting officer in *Fernandez* observed blood in the neighbor's apartment that corroborated the neighbor's allegation of an assault, Det. Zambito observed Umirov's injuries at Lutheran Hospital and was aware that Umirov had been stabbed, based on his police report.

*Sankar v. City of New York*, 867 F. Supp. 2d 297 (E.D.N.Y. 2012), on which plaintiff relies (Pl. Opp'n at 11), is distinguishable. In *Sankar*, a landlord had an ongoing dispute with her tenant that resulted in eviction proceedings. *See id.* at 302. Before the tenant could be evicted, the tenant called police to report that the landlord was assaulting her. *See id.* The tenant conveyed to a responding officer that the landlord and the tenant had been in "an ongoing dispute" predating the assault. *See id.* The tenant told the officer that prior to her call to police, she had gone upstairs to ask the landlord for hot water, at which point the landlord threw hot water on her that burned her hand and neck. *See id.* Officers thereafter entered the landlord's apartment and arrested her, "despite [the landlord's] confusion and protestations of innocence." *Id.* at 302-03. The landlord was charged with assault and harassment. *Id.* at 303. All of the charges against the landlord were ultimately dismissed. *Id.* at 305.

The landlord's subsequent false arrest claim against the arresting officers survived summary judgment because of the known contentious relationship between the landlord and the tenant, but also in large part because there were genuine issues of material fact regarding whether any of the "arresting officers actually observed any injuries consistent with [the tenant's] claim that [the landlord] scalded her with hot water." *Id.* at 306-07. By contrast, here, the dispute between plaintiff and Umirov was not "ongoing." Det. Zambito was aware that plaintiff and Umirov had directly interacted on a single prior occasion, the shooting incident less than one week before Umirov was stabbed. Further, and more fundamentally, Det. Zamibto personally witnessed Umirov's serious injuries, which were consistent with his allegations that plaintiff had stabbed him. Accordingly, probable cause did not dissipate on the basis of the known prior relationship between plaintiff and Umirov. *See Curanaj v. Cordone*, No. 10-CV-5689, 2012 WL 4221042, at *10 (S.D.N.Y. Sept. 19, 2012) ("Notwithstanding the history of bad blood between the Parties, the Officers could not be expected to turn a blind eye to a plausible allegation of the threat of physical violence.").

    **iv. Umirov's Failure to Name Plaintiff at the First Interview**

Plaintiff's final argument is that Umirov's failure to provide Det. Zambito with plaintiff's name during the first interview at the hospital significantly undermined the legitimacy of Umirov's subsequent identification. First, it is undisputed that Umirov ultimately identified plaintiff as the assailant at least as soon as the second interview, when he signed a photograph and statement identifying plaintiff as the person who stabbed him. (Def. 56.1 at ¶¶ 82-86; Sohn Decl., Ex. Q.) It is also undisputed that, when Det. Zambito first visited Umirov in the hospital, he was drowsy from sedation and would have been unable to look at a photograph (even if Det. Zambito had possessed one) at the time of the first interview. (Pl. 56.1 at ¶ 119.) Second, the parties do not dispute that Umirov identified plaintiff *before* plaintiff's arrest. (Sohn Decl., Ex. Q.) Under the circumstances outlined above, the court cannot conclude that Umirov's failure to identify plaintiff at the first interview seriously undermined his subsequent, undisputed identification, which occurred before plaintiff's arrest. Accordingly, there was probable cause to arrest plaintiff for the January 20, 2013 stabbing.

## II.  *Qualified Immunity*

Defendant argues that even if plaintiff's arrest was not supported by probable cause, he is nevertheless entitled to

qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).

Even if a court ultimately concludes probable cause to arrest did not exist, "an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). Arguable probable cause exists when "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir. 1997) (emphasis in original) (internal quotation marks and citation omitted); *see also Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (holding that "in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity"); *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (recognizing that

arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met").

Here, even if probable cause did not exist to arrest plaintiff, defendant is entitled to qualified immunity. The court agrees with plaintiff that some conflicting evidence was presented to Det. Zambito regarding the person who stabbed Umirov. Viewing the facts in the light most favorable to plaintiff, as the court must, Det. Zambito was aware that Umirov's companion Sharobim appeared to have reported that Tyreq was a possible perpetrator of the stabbing, though the report does not indicate that Sharobim witnessed the stabbing. Det. Zambito took steps to investigate Tyreq. He viewed a photograph of Tyreq and left a note to himself to have Sharobim inspect the photograph. He also knew about the conflicting allegations arising from the January 16, 2013 event. On the other hand, before Det. Zambito arrested plaintiff on January 21, 2013, Umirov had orally reported that plaintiff stabbed him and had signed a photograph of plaintiff along with Umirov's written statement identifying plaintiff as Umirov's assailant. Det. Zambito had personally observed Umirov's injuries, corroborating part of Umirov's allegations. Finally, Det. Zambito

knew that Umirov had also accused plaintiff of shooting him on January 16, 2013.

Even if some reasonable officers might have conducted a further investigation, the court cannot conclude that Det. Zambito's choice to arrest plaintiff was objectively unreasonable. It simply cannot be said, based on the current record, that "no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995); *see also Doe v. Smith*, 704 F. Supp. 1177, 1187 (S.D.N.Y. 1988) (recognizing that there is "no requirement that probable cause requires unequivocal evidence as to the guilt of the suspect, a burden not even imposed at a criminal trial"). Accordingly, the court finds alternatively that Det. Zambito is entitled to qualified immunity.

## III. *Supplemental Jurisdiction*

Having dismissed plaintiff's sole remaining federal claim, the court declines to exercise supplemental jurisdiction over the pendent state law claims for intentional and negligent infliction of emotional distress. *See* 28 U.S.C. § 1367(c)(3) (permitting courts to decline supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction"); *Reyes v. Coll. of Sci. Admin.*

*Rochester Inst. of Tech.*, 51 F. Supp. 3d 275, 278 (W.D.N.Y. 2014) ("Having disposed of plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining claim for intentional infliction of emotional distress."); *Wright v. Santopietro*, 325 F. Supp. 2d 79, 82 (D. Conn. 2003) (dismissing federal claims including claim for false arrest and declining to exercise supplemental jurisdiction over pendent intentional infliction of emotional distress claim).

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED as to plaintiff's federal false arrest claim. The court declines to exercise supplemental jurisdiction over plaintiff's claims for intentional infliction of emotional distress and negligent infliction of emotional distress. The Clerk of Court is respectfully directed to enter judgment against plaintiff on his federal false arrest claim and close this case.

**SO ORDERED.**

Dated:    September 30, 2016
          Brooklyn, New York

                                    _____/s/_____
                                    Kiyo A. Matsumoto
                                    United States District Judge